**In re MAHONEY HAWKES, LLP, Debtor.**

No. 01–12880–WCH.

United States Bankruptcy Court,
D. Massachusetts,
Eastern Division.

Sept. 29, 2005.

**42**

Ruth M. Bayley, Mintz, Levin, Cohn, Ferris, Glovsky, Boston, MA, Joel G. Beckman, Nystrom Beckman & Paris LLP, Boston, MA, Daniel S. Bleck, Mints, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, John T. Daley, Dane & Howe, LLP, Boston, MA, David Duncan, Zalkind, Rodriguez, Lunt & Duncan, Boston, MA, Janet E. Dutcher, Law Office of Paul Kazarosian, Haverhill, MA, Richard D. Glovsky, Prince, Lobel, Glovsky & Tye, LLP, Boston, MA, Philip H. Graeter, Sherin and Lodgen LLP, Boston, MA, James C. Gross, Klieman, Lyons, Schindler & Gross, Boston, MA, David Hadas, Massachusetts Attorney General's Of Assistant Attorney General, Boston, MA, Ian Hammel, Mintz, Levin, Cohn, Ferris, Glovsky and Pope, Boston, MA, Marian B. Hand, Duane Morris LLP, Boston, MA, Allen J. Holland, Jr., Lynch, Brewer, Hoffman & Sands, LLP, Boston, MA, James E. Howard, Charlestown, MA, William W. Kannel, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Michael Kendall, McDermott, Will & Emery, Boston, MA, Dale C. Kerester, Lynch, Brewer, Hoffman & Sands, LLP, Boston, MA, Kenneth D. Kerr, Quincy, MA, Frank D. Kirby, Frank D. Kirby & Associates, P.C., South Boston, MA, Peter B. Krupp, Lurie & Krupp, Boston, MA, John C. La Liberte, Sherin and Lodgen LLP, Boston, MA, David B. Madoff, Madoff & Khoury LLP, Foxboro, MA, George L. Marlette, Brockton, MA, James Michael Merberg, Law Offices of James Michael Merberg, Boston, MA, Richard E. Mikels, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Boston, MA, Robert J. Muldoon, Jr., Sherin and Lodgen LLP, Boston, MA, Pamela R. O'Brien, Holland & Knight LLP, Boston, MA, Jonathan D. Plaut, Prince, Lobel, Glovsky & Tye, LLP, Boston, MA, Jeffrey D. Sternklar, Duane Morris, LLP, Boston, MA, James F. Wallack, Goulston & Storrs, PC, Boston, MA, Lynne B. Xerras, Holland & Knight LLP, Boston, MA, for Creditors.

David B. Madoff, Madoff & Khoury LLP, Foxboro, MA, Christopher J. Panos, Craig and Macauley, P.C., Boston, MA, Kathleen Rahbany, Craig and Macauley, P.C., Boston, MA, for Debtors.

## MEMORANDUM OF DECISION REGARDING OBJECTION OF DEBTOR AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PROOF OF CLAIM OF GO–BEST ASSETS LIMITED

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. *Introduction*

Mahoney Hawkes, LLP (the "Debtor") and the Official Committee of Unsecured Creditors of the Debtor (the "Committee") filed an objection to the proof of claim of Go–Best Assets Limited ("Go–Best"). They argued that Go–Best cannot hold a malpractice claim based upon its failed investment activities with a former partner of the Debtor because such activities did not create an attorney-client relationship between Go–Best and the Debtor. Go–Best responded defending the validity of its claim. Based upon the following findings of fact and conclusions of law, I will enter an order sustaining the objection.

### II. *Background*

#### A. *Procedural Background*

The Debtor was a law firm engaged solely in the practice of law.[1] A former partner of the Debtor, Morris Goldings ("Goldings") mishandled client funds. At the time the Debtor filed for Chapter 11 relief on April 6, 2001, it was the subject of several malpractice claims as a result of his actions.[2] *See In re Mahoney Hawkes, LLP,* 289 B.R. 285 (Bankr.D.Mass.2002). The United States Trustee appointed the Committee on April 23, 2001. A plan of reorganization has not been confirmed.

On October 3, 2001, Go–Best filed a proof of claim in the amount of $6,588,400 (the "Claim"). The basis for the Claim was set forth in the Verified Complaint which Go–Best had filed in the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts in February of 2001 (the "Complaint"). Go–Best described the Complaint as one for "damages as a result of, among other things, the misappropriation, breach of contract and deception by Morris M. Goldings, in his capacity as a lawyer and a named partner at Mahoney, Hawkes & Goldings, LLP, and the apparent disappearance of plaintiff's money." Complaint, p. 2.

Subsequent to the objection to Claim and response thereto, the Debtor and the Committee filed a motion for summary judgment. Go–Best filed an objection and a cross-motion for summary judgment. I denied both motions and set the matter for an evidentiary hearing. The parties stipulated that the hearing would be bifurcated to allow first for the determination as to whether the Debtor owed Go–Best any duty that could have been breached. The parties also filed their Joint Pretrial Statement With Respect to Objection of Debtor and Official Committee of Unsecured Creditors to Proof of Claim of Go–Best Assets Limited (the "PTS"). I held a hearing and took the matter under advisement.

#### B. *Factual Background*

The following facts are based upon the agreed-upon facts in the PTS and the testimony and evidence at the evidentiary hearing.

##### 1. The Players

Go–Best is a corporation which Kan Shu Ming ("Kan") formed to invest his personal

---

1. The Debtor was formerly known as Mahoney Hawkes & Goldings, LLP.

2. In its Statement of Financial Affairs, the Debtor indicates that Goldings withdrew from the partnership on December 31, 2000. See Docket No. 18.

assets. Kan is the sole beneficial owner. Go–Best is one of at least 10 entities which Kan has formed for investment purposes. It was formed in the British Virgin Islands to take advantage of their tax laws.

Kan received a degree in Computer Science and Accounting from the University of Manchester in 1980 and has been working as an accountant since that time. Kan has been a partner of Wong Brothers & Co., a firm of certified public accountants in Hong Kong since 1990. Go–Best and the other entities which he has formed are separate from Wong Brothers and he does not share any of the profits from his investment vehicles with his partners.

Prior to his companies' investments with Goldings, Kan was involved in two investment opportunities in the United States during the summer of 1997. In both deals, Go–Best lent a total of $950,000 with interest of 30% per annum on each loan. To obtain information about the transactions, Kan relied on the advice and assistance of two individual intermediaries who are described below.

Go–Best hired counsel, a Boston law firm not involved in these proceedings, to represent it in these initial investments and gave its counsel a power of attorney. The binders which contained the documentation for these two transactions were entered into evidence. On the cover of the bound volumes are the name and address of counsel. The first binder contains copies of the six loan documents and five consents and certificates. Included in the miscellaneous section are seven documents including a conflict waiver which Go–Best signed and an opinion letter for Go–Best which special counsel to the borrower signed. The second binder contains copies of six loan documents, two certificates and consents and four miscellaneous documents which include a waiver that Go–Best signed. Both loan agreements provided that any notices would go to the lawyer to whom Go–Best had executed a power of attorney.

Goldings was an experienced and prominent lawyer who was a founding and one-time managing partner of the Debtor. At the evidentiary hearing, his former partners explained that Goldings enjoyed a stellar reputation and was considered to be an excellent litigator with high standards. They testified that in the winter of 2000, when it came to light that client funds were missing, Goldings checked into a hospital. Goldings did not testify at the hearing.[3]

While he was a partner, Goldings established an account at Citizens Bank entitled the Morris Goldings Client Funds Account (the "Account"). The partners at the Debtor knew of the Account but did not oversee it or determine whether it was in compliance with applicable rules regarding a client funds account. Goldings' secretary helped administer the Account and Goldings would pay the Debtor for his clients' bills from the Account.

Paul Hoiriis ("Hoiriis") is the Chief Financial Officer for Aqua Leisure Industries, Inc. He holds a Master's degree in Business Administration and has been involved in corporate management for almost thirty years. The chairman of Aqua Leisure is Simon Fireman. Hoiriis has been involved in many negotiations between business entities but none where all of the participating parties were represented by the same counsel.

---

**3.** The Court takes notice that creditors including Go–Best filed an involuntary petition against Goldings on March 29, 2001 and he waived his discharge. *See* Docket No. 01–12581–WCH. The Court takes further notice that on April 17, 2002, Goldings was disbarred. *See* *http://massbbo.org/bbolookup.php.*

In 1996, during the course of his duties with Aqua Leisure, Hoiriis became acquainted with Goldings as Goldings represented the company. Also in the course of his employment, Hoiriis visited Hong Kong several times annually to oversee a subsidiary named Greyland. In 1994, he became acquainted with Kan whose company provided accounting services for Hoiriis' company. Kan eventually let Hoiriis know that he was interested in obtaining investments in the United States. During the transactions set forth below, Hoiriis conveyed information between Kan or his investment vehicles and Goldings. He was not an employee or an attorney for either party. He explained at trial that he entertains a sense of culpability for the eventual loss of Go–Best's funds and worries that a negative outcome in these proceedings will have an effect his relationship with the Kan.

Andrew Lam was a partner in Wong Brothers & Co. until 2000. He holds a law degree and is licensed to practice law in the United Kingdom, Hong Kong and Australia. During all but the last transaction described below, Lam served as the conduit between Kan and Hoiriis. He was not an employee of Kan or his entities or their lawyer. He did not testify at the evidentiary hearing and the parties reported that he is pursuing a theology studies in Australia.

## 2. The Deals

The Claim arises from two transactions which the parties refer to as the Starwood transaction and the Rodin transaction. Goldings and Kan were involved in two prior transactions which the parties generally refer to as the Jedrick transaction and the Kline transaction. The transactions arise from Kan's desire to engage in investments in the United States, Hoiriis' offer to facilitate that goal and Goldings'

descriptions of unique investment joint ventures. Each transaction will be described in turn.

### i. The Jedrick Transaction

In 1997, Goldings was at the offices of Aqua Leisure and proposed, in Hoiriis' words, an investment opportunity to Mr. Fireman. Fireman declined and Hoiriis and Goldings adjourned to discuss Hoiriis contacting Kan and presenting the proposed deal. Kan was interested and chose one of his entities, Jedrick International, Limited ("Jedrick"), to participate in the joint venture to acquire hotel properties for investment and resale.

According to Hoiriis, Goldings presented him with a draft joint venture agreement. Hoiriis reviewed it for business issues and once Goldings incorporated his comments, Hoiriis sent it to Hong Kong. Hoiriis explained the transaction to Lam who conveyed to Kan that Goldings was trustworthy. Hoiriis also obtained from Goldings a copy of the declaration page of the malpractice insurance of the Debtor which was effective from February of 1997 until February of 1998, and showed a limit of $5,000,000. Hoiriis and Kan explained that they understood that the policy would cover the funds placed in the Account. They did not review the policy in its entirety.

On October 18, 1997 Jedrick and Goldings signed a Joint Venture Agreement (the "Agreement") which provided that Jedrick would provide up to $5,000,000 and "Goldings will make no cash contribution to the joint venture, but shall provide the services of John Kapioltas for consultation on the acquisition of hotel properties and shall provide consultation on the legal issues relating to the acquisition and financing for the hotel properties." Agreement, p. 1. The Agreement also provided that

Jedrick would be repaid within one year with interest at 8%.

Hoiriis and Kan testified that Goldings gave legal advice on the formation of the entity, the drafting of the documents and the legality of the transaction. Upon further reflection, however, Kan explained that he couldn't remember if Goldings actually provided the services as the joint venture never purchased any properties. During this transactions and all of those that followed, Kan never spoke directly to Goldings.

After the Agreement was signed, Jedrick transferred $3,000,000 to the Account. In January of 1998, Hoiriis asked Goldings to return $1,000,000 to Jedrick. In August of 1998, the parties entered into another joint venture agreement which was the same as the Agreement except that it altered the profit provisions from a 60–40 split in favor of Goldings to a 50–50 split of the profits. There is no mention in either document of the Debtor.

With respect to the Jedrick transaction, Kan testified that he never had any contact with Goldings or the Debtor. Rather, it was Lam who provided him information about the transaction after Lam had received the details from Hoiriis. Both Kan and Hoiriis acknowledged that after repayment of the invested funds plus interest, Goldings did not receive any funds from the transaction and they did not receive an invoice from the Debtor. Both men were evasive in their responses to the extent of the delay in the return of the funds and eventually acknowledged that it was more than a brief delay before Goldings returned the funds.

### ii. The Kline Transaction

Around June of 1999, Goldings contacted Hoiriis and explained that as a representative of an estate, he had the authority and need to sell a piece of artwork by Franz Kline to a predetermined buyer who could not purchase the work until a later date. The point of the deal was to have Goldings purchase the artwork immediately with funds from Kan and sell it in the near future to the buyer at a higher price. Goldings sent Hoiriis a facsimile about the deal on a cover sheet of the Debtor.

Hoiriis explained that he understood that Goldings would be representing all parties in the matter, including the estate seller and the future buyer and that Goldings assured him that the seller approved of this arrangement. After explaining the deal to Lam, Hoiriis understood that Go–Best would be the entity that would provide the funds for the deal.

Go–Best lent Goldings $450,000. On June 15, 1999, Goldings issued a promissory note to Go–Best promising to repay that sum within three months with interest at 10% per annum. He also executed a pledge and security agreement granting Go–Best a security interest in the artwork. On both documents, Goldings used the street address of the Debtor but the Debtor is not referenced in any way on either document. There is no mention in these documents about Goldings providing legal services. Go–Best did receive the funds with interest but later than the time frame set forth in the promissory note.

Hoiriis and Kan explained that the legal advice which Goldings provided was consultation on the legitimacy of the transaction and drafts of the documents. It did not concern them that there was no engagement letter or bill because Goldings was representing them and he was receiving a percentage from the transaction.

### iii. The Starwood Transaction

In July of 2000, Goldings sent to Simon Fireman a facsimile which contained a memorandum. Both documents were

typed on the letterhead of the Debtor. Goldings offered to have Fireman place three to five million dollars in escrow with Goldings for the purchase of a publically traded stock at thirty dollars a share. He explained that the stock would not be further traded for six months at which time the stock price would have risen to $40 a share based upon a tender offer. Goldings explained that any appreciation due to either time or tender offer would be spilt 50–50 and that he would have a means by which to soften any drop in value.

Fireman did not pursue the deal but Hoiriis contacted Lam who contacted Kan to discuss the transaction. Kan agreed to the deal but insisted that the monies for the deal be placed not in the Account but in an escrow account. This requirement was the result of the failure of Goldings to return the money from the Jedrick and Kline transactions in a timely fashion.

Goldings drafted the escrow agreement, agreement and promissory note and sent these documents to Hoiriis via a facsimile. The cover sheet was on the Debtor's letterhead and the note on the cover sheet indicated that Goldings took no pride in the authorship. Among the comments which he conveyed to Goldings on the drafts, Hoiriis told Goldings that the draft escrow agreement which had as parties Paine Webber Securities and Goldings, had to be amended to include Go–Best.

Go–Best and Goldings signed the documents for this transaction on July 13, 2000 after Hoiriis and Lam made revisions to the document. The escrow agreement provided that Goldings and Go–Best would deliver to an escrow account with Paine-Webber Securities the sum of $3,000,000 and shares of stock. That agreement was amended that day to provide that Go–Best and Goldings would deliver $5,000,000 to the escrowee. The agreement between Go–Best and Goldings provided that Gold-ings would place the money and stock into the escrow account. It further provided for the conditions under which the stock would be sold and the conditions under which any profits would be divided. It also provided that Goldings would incur the costs of the escrow arrangement and would pay Go–Best a transaction fee of $75,000. The agreement made no mention of Goldings providing legal services. The Promissory Note stated that Goldings promised to pay Go–Best $5,000,000 plus interest of 2% per month on or before January 2, 2001 and agreed to pay any reasonable attorneys fees for collection.

Communications from Goldings to Hoiriis in this matter were reflected on letterhead from the Debtor. The documents which formed the deal, however, contain no reference to the Debtor.

On July 14, 2000, Go–Best caused to be wired $5,000,000 to the Account in two separate wires.

Kan and Hoiriis explained that they understood that Goldings would be representing all parties and that he would be giving Go–Best legal advice as to the form of the investment, the documents required and the propriety of the investment. Kan never communicated with Goldings directly; rather, he discussed the deal with Lam who had obtained the information from Hoiriis. Kan or Go–Best never discussed this matter with anyone at the Debtor and never received a bill from the Debtor. Go–Best did not request to review the malpractice policy and Kan testified that he understood that the funds in this deal would not be subject to that policy as they were no longer in the Account but in escrow.

The Starwood Transaction never materialized and the funds and the stock have not been recovered. After Go–Best determined that the deal was a fiction it did not

contact anyone at the Debtor or the Debtor's malpractice carrier.

#### iv. The Rodin Transaction

In August of 2000, Golding sent a facsimile to Hoiriis and Simon Fireman with the opportunity to purchase a cast of Rodin's sculpture, The Thinker, for $560,000 and resell it one month later for $720,000 and split the profits. Goldings offered to pay the $9,000 commission for the sale out of his share of the proceeds. The facsimile was not written on the Debtor's letterhead.

Goldings explained that documents for the transaction were attached to the facsimile. The attachments included an escrow agreement and an invoice. The escrow agreement was between MultiLine Properties Limited, a law firm which was to act as escrow agent and Monumental Sculptures, the agent for the seller. The agreement provided that Multi Line would wire $560,000 to the IOLTA account of the law firm. Ultimately, $500,000 was to be wired to the seller. Go–Best was not a party to the escrow agreement and is not identified in the document.

Hoiriis explained that he understood from Goldings that Goldings would be representing all of the parties. In the notice section of the escrow agreement, however, each party gave a distinct address. There is no indication that Goldings or the Debtor was representing any of the parties other than the fact the address for Multi Line is listed care of the Debtor. Hoiriis also said that Goldings provided advice that this was a valid transaction and Goldings drafted the documentation.

On August 28, 2000, Goldings issued a promissory note to Go–Best promising to pay $ 560,000 with the rate of 2% per month within one month. The note stated that it was secured by a security interest in certain assets of the maker. Also on that date, Jean Goldings, the wife of Gold-

ings, issued a guarantee of the debt. Hoiriis first explained that Goldings offered this guarantee and then testified that Go–Best required it for additional security given that the funds would not be deposited in the Account. There were no other documents that memorialized this transaction. Go–Best never received a payment on this note.

#### 3. The Postlude

By the end of 2000, Hoiriis began to write and call Goldings to discuss the deals which remained outstanding. Goldings sent Hoiriis a statement from Deutsche Banc that reflected an account with deposits of approximately $3.5 million which Goldings claimed he could use to repay the Rodin transaction. There is no evidence that the money was available to Goldings to use as he suggested. The mailing address for the statement was to Goldings at the Debtor. Goldings also assigned to Go–Best certain put options which he held in connection with the Starwood transaction.

By December, Hoiriis wrote to Goldings that the note was in default for the Rodin transaction. In December of 2000, Goldings and his wife issued to Go–Best a mortgage on their house. Less than a week later, Hoiriis discovered that the mortgage was worthless as the house was heavily mortgaged. He then indicated that Go–Best would be withdrawing from the Starwood transaction.

The Debtor has no documentation in its records indicating that Go–Best was a client of the firm. It received no payments from Go–Best, sent no invoices to Go–Best and had no retention agreement with Go–Best. After Go–Best filed the Verified Complaint, the Debtor discovered documents in its computer system related to the Starwood and Rodin transactions. Goldings and his secretary kept files relat-

ed to these transactions in their files at the Debtor.

## III. *Analysis*

### A. *Burden of Proof*

A "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr.P. 3001. "The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is support by substantial evidence.... Once the trustee manages the initial burden of producing substantial evidence, however, the ultimate risk of non-persuasion as to the allowability of the claim resides with the party asserting the claim." *In re Hemingway Transport Inc.,* 993 F.2d 915, 925 (1st Cir.1993), *cert. denied,* 510 U.S. 914, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993).

At the commencement of the trial, Go–Best argued that the burden had not shifted because the Debtor and the Committee had failed to provide substantial evidence to support their objection. The Debtor and the Committee argued that based upon the summary judgment motion, affidavits attached thereto and the stipulated facts in the PTS, that they had given substantial evidence to demonstrate that I cannot conclude that Go–Best was a client of the Debtor. Go–Best argued that this proffer was insufficient and at trial, I ruled in favor of Go–Best. Ultimately, as demonstrated by what follows, the Debtor and the Committee did provide substantial evidence and Go–Best was unable to establish that an attorney-relationship existed between Go–Best and the Debtor.

### B. *Whether an Attorney–Client Relationship Existed Between the Debtor and Go–Best*

All sides in this case do not dispute the standard in the Commonwealth for determining when an attorney-client relationship is formed. Writing for the First Circuit, Judge Selya explained that apart from an express agreement (which does not exist in this case) an attorney-client relationship may be implied

> when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance ... In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it.

*Sheinkopf v. Stone,* 927 F.2d 1259, 1264 (1st Cir.1991) (citing *DeVaux v. American Home Assur. Co.,* 387 Mass. 814, 444 N.E.2d 355, 357 (1983)).

In *Sheinkopf,* the plaintiff had invested in and guaranteed the debts of a joint venture at the request of a partner in a Boston law firm who was his long time friend. 927 F.2d at 1264. The plaintiff signed documents at the partner's request, met with the partner in his office and dealt with the partner's secretary. *Id.* at 1265. The plaintiff never sought outside counsel although he regularly used another Boston firm and never received a bill from the law firm. *Id.* After the joint venture failed, the plaintiff sued the partner's firm. The lower court granted summary judgment in favor of the defendant law firm.

Judge Selya wrote that based upon the facts "no reasonable factfinder could conclude either that the [plaintiff's] reliance on [the partner] for 'legal' as opposed to 'investment' advice was reasonable or that

[the partner] should have been aware that [the plaintiff] would so rely." *Id.* The only legal advice which the plaintiff could describe was a comment which the partner made during a casual conversation that he would protect the plaintiff. *Id.* at 1266. The First Circuit found this comment to be too ambiguous to constitute reasonable reliance. *Id.* The court found further confirmation of its conclusion that the plaintiff's reliance was not reasonable in the acts of the plaintiff, a successful businessman, such as signing documents without reading or appreciating their substance. *Id.* The court found no evidence that the partner knew that the plaintiff was looking to him for advice particularly because there was no prior professional relationship and no formal retention or fee arrangement. *Id.*

> Judge Selya wrote
>
> To imply an attorney-client relationship, therefore, the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing, who happens to be a lawyer, has become *his* lawyer. If any such belief is to form a foundation for the implication of a relationship of trust and confidence, it must be objectively reasonable under the totality of circumstances.... A reasonable businessman in [the plaintiff's] shoes might have assumed that [the partner] had become his real estate guru, his business partner, his investment adviser, or even his fugleman—but no reasonable businessman would have assumed, on these facts, that [the partner] had become his attorney.

*Id.* at 1265.

Other cases applying Massachusetts law have elaborated on this standard. In *Francis v. Goodman*, 91 F.3d 121 (1st Cir.1996) (unpublished opinion), the First Circuit wrote of a landlord who claimed to have relied on her tenant's paramour for legal advice. In finding for the tenant's attorney, the court ruled that "we cannot disturb the well-supported district court finding that [the attorney] had no reason to know that [the non-attorney] was seeking legal advice from him, as opposed to an appraisal of his company's financial ability, as her tenant, to pay the store rent, and that the trust [the non-attorney] placed in [the attorney] was due, in large part, to their intimate relationship."

In *Symmons v. O'Keeffe*, 419 Mass. 288, 300, 644 N.E.2d 631 (1995), the plaintiffs sued the defendant law firm for damages resulting from the formation of certain trusts. The court started by explaining that the plaintiffs were required to demonstrate that there was an attorney-client relationship during the formation of the trusts and that they were not relying on a former relationship. *Id.* at 639. The court found that because none of the plaintiffs asked for the defendant firm to represent them in this matter, the parties did not enter into a fee arrangement and the parties did not exchange money, no attorney-client relationship existed. *Id.*

In *Fanaras Enterprises, Inc. v. Doane*, 423 Mass. 121, 666 N.E.2d 1003 (1996), the client had paid the lawyer a quarterly retainer "for full, total, and immediate access to [the lawyer's] legal advice." *Id.* at 122, 666 N.E.2d 1003. The client made various loans to the lawyer and before repayment the lawyer filed for bankruptcy relief. The client sued for malpractice and sought recovery under the malpractice policy. The court applied the standard cited above, citing for support *DeVaux v. American Home Assurance Co.*, 387 Mass. 814, 817–818, 444 N.E.2d 355 (1983).[4] The

---

**4.** In *DeVaux*, the Supreme Judicial Court cautioned that "agreement or consent of an attorney to represent a client in a particular matter does not create an attorney-client rela-

court ruled that the retainer for full access was not evidence that the client had sought advice from the lawyer on the loans which he made to the lawyer. *Id.* at 125, 666 N.E.2d 1003. The fact that the client claimed to have relied on the attorney to protect him was insufficient to create a relationship with respect to the loans.

In *Robertson v. Gaston Snow & Ely Bartlett,* 404 Mass. 515, 536 N.E.2d 344 (1989), the plaintiff was a former officer of a corporation that the defendant law firm represented during a reorganization. 404 Mass. at 517, 536 N.E.2d 344. In ruling that there existed no attorney–client relationship between the parties, the court explained:

> To show the existence of an attorney-client relationship the plaintiff points to [the law firm's] prior representation of him, the fact that [the law firm] still retained the original of his will in its office, and the plaintiff's testimony that he believed that [the law firm] now would be representing his interests. The law firm's evidence was that neither [partner] thought that the plaintiff was a client whose interests guided [the law firm's] actions during the restructuring. Hoehn testified that the law firm was representing the interests of both the old and new corporations. His uncontroverted testimony was that, at no time during the reorganization process, did the plaintiff ever request personal representation, nor did [the partner] ever indicate to the plaintiff that [the law firm] was representing his interests. Regarding the sample employment agreement sent to the plaintiff, [the partner] testified that the plaintiff neither discussed it with him nor returned it completed with any personal information. It was also uncontroverted that [the law firm] had no specific contract to represent the

plaintiff in the reorganization, and that they billed the corporation for their services. In spite of several written and many oral communications between the plaintiff and the other participants, the plaintiff and the other participants, the plaintiff introduced no evidence of a specific reference to [the law firm] as his personal counsel. His claim is essentially, therefore, that he thought that [the law firm] represented him but that he failed to communicate this thought to anyone.

404 Mass. at 522–3, 536 N.E.2d 344.

Both parties use *Sheinkopf* to support their positions and to claim that it is dispositive of whether there was an attorney-client relationship between the Debtor and Go–Best. Go–Best contends that the case is easily distinguishable because here, unlike in *Sheinkopf,* the parties had two prior deals one of which specified that Goldings was providing legal advice. Also, while the partner in *Sheinkopf* knew the plaintiff had used a different Boston law firm, here Goldings had no knowledge of another firm. Although *Sheinkopf* had not asked for advice, here Go–Best understood Goldings to be offering the same. Unlike *Sheinkopf,* contends Go–Best, Kan and Lam were not sophisticated about the laws of the United States. Unlike *Sheinkopf,* here the parties discussed the deals in detail.

Apart from *Sheinkopf,* Go–Best highlights its reasonable reliance that Goldings was its lawyer for the Rodin and Starwood transactions because he specifically stated that he would provide advice for the Jedrick transaction and had provided a copy of his malpractice policy for the Jedrick transaction.

tionship as to other affairs of the client." 387 Mass. at 817 n. 6, 444 N.E.2d 355.

Alternatively, Go–Best contends that the Debtor owed it a duty of care because the partners knew of the Account and had a duty to supervise the funds therein. This is particularly so after they discovered improprieties with respect to Goldings' actions with the Account and the Debtor's client funds account.

The Committee and the Debtor disagree. They contend that in order for there to be an attorney client relationship under *Sheinkopf*, Go–Best must have sought advice from Goldings, the advice must have pertained to matters within Golding's area of expertise and Golding's must have agreed to provide the service. The Debtor and the Committee argue that Go–Best never sought out Goldings for his advice, investment advice is not within the scope of Goldings' area of expertise, and more importantly, the facts of this case do not warrant a finding of reasonable reliance. I agree.

There is no evidence that Go–Best requested that Goldings or the Debtor provided it with legal advice for the transactions. Certainly, investment advice was not within Goldings' area of expertise. Therefore, evidence of the first two factors does not exist.

Part of its reliance, contends Go–Best, is that there were conversations between Hoiriis and Goldings when Goldings made comments that Hoiriis took to mean Goldings would represent them. I found Hoiriis unduly vague in this regard. He could not describe the conversations with any detail and gave pat responses as to what he assumed that Goldings would be doing in the way of legal work for each deal. On the whole, Hoiriis' testimony was inconsistent, lacking in candor and suspect given that he has much to lose if Go–Best does not prevail.

With respect to the Jedrick transaction, the documents indicate that the advice Goldings was to give was to the joint venture and not to Jedrick. Moreover, I find the alleged reliance on that language to be suspect when Go–Best made no requests that the same be inserted into any documents for the Starwood or Rodin transactions. Additionally, as the cases above make clear, the fact that a lawyer has represented a client in a deal does not mean that the lawyer is the client's lawyer for any subsequent deal.

Lam and Kan claim to be unsophisticated about the laws of the United States. Go–Best, however, had invested in the United States in two prior deals which also involved loaning money. The binders were thick, detailed and clearly identified Go–Bests' lawyers. The slim number of documents in the deals with Goldings stands in sharp contrast. Additionally. both Kan and Lam are well-educated and sophisticated businessmen and understand the difference between their business careers and their investing activities.

Kan, who was capable of speaking English, never contacted Goldings. Go–Best did not obtain an agreement from the Debtor for its representation. Go–Best did not receive a bill for services rendered. Go–Best never paid the Debtor for any services. Go–Best did not reexamine a potentially expired insurance, a policy upon which it claimed to have placed great importance.

The two transactions were riddled with conflicts and Go–Best is disingenuous when it claims that it understood Goldings to be representing it at the same time that Goldings, individually, was signing promissory notes to Go–Best and providing the company with a mortgage from his wife. In fact, Go–Best was required to correct documents which Goldings had drafted to ensure that it was protected. Even if Kan and Lam had experience with lawyers rep-

resenting multiple parties, these conflicts should have raised a red flag. Moreover, Go–Best claims to have relied on Hoiriis who explained that this was the first deal in many in which he was involved to have multiple representation and on Lam who was a trained lawyer. Their professed lack of concern regarding multiple representation lacks credibility. These are not reasonable indicators that the person on the other side of the table is guided by your interests.

Moreover, Go–Best had a less than stellar experience with Goldings during the first two deals. As a result, it had to take steps to protect its money from future troubles with Goldings. These are not indications that Go–Best had a reasonable expectation of a relationship of trust and confidence with Goldings. Moreover, two prior deals with mixed results do not constitute much of a prior relationship, a factor discussed in *Sheinkopf.*

Go–Best places great importance on the fact that Goldings used the Debtor's letterhead on communications. In the documents which provided the foundation for the legal relationship between the parties, however, there is no mention of the Debtor. All of these documents run between Goldings and Go–Best. Even the Account does not contain a reference to the Debtor. This is quite unlike Go–Bests first two forays into investing in the United States where their firm's name is sprinkled throughout the closing documents.

When Go–Best had doubt about Goldings' treatment of its funds, Go–Best never contacted anyone at the Debtor. Go–Best at no time contacted the malpractice insurance carrier. Go–Best did not contact the Board of Bar Overseers.

Go–Best sought investments in the United States. Goldings, through two intermediaries, presented two deals which appeared to offer good profits in a short period of time. Go–Best decided to use the advice of the intermediaries, one of whom it had know for a long time and the other for a short time, and engage in the speculative ventures with Goldings. Both sides were in it for their own profit. Just as Wong Brothers was not going to benefit, there is nothing to indicate that the Debtor would receive any benefit. It was an investment between two parties and nothing more. It is unfortunate that the risk that Go–Best took in relying on its intermediaries to help its investment ventures did not produce the potential profit. Its misfortune, however, cannot be remedied by a party that owes Go–Best no duty. I conclude that no attorney-client relationship existed between Go–Best and the Debtor.

### C. Whether the Debtor Owed Go–Best a Duty of Care

Go–Best contends that because the partners of the Debtor were aware but failed to prevent Goldings from maintaining the Account in accordance with the policies of the firm or the rules governing client funds accounts, the Debtor owed a duty to Go–Best and is liable based upon the partners' negligent oversight of the Account. In support, Go–Best contends that it was foreseeable that client funds would be deposited into the Account and as a result, the Debtor had a duty to supervise Golding's use of the account at least as late as when Goldings transferred money from the Debtor's clients fund account. The Debtor and the Committee contend that under Massachusetts law, there can be no breach of a duty where there is no attorney client privilege.

The Debtor and Committee are correct that the general rule in Massachusetts is that an attorney may be liable for negligence provided the attorney owed a

duty to a client. *One National Bank v. Antonellis*, 80 F.3d 606, 609 (1st Cir.1996). The exception, however, is where foreseeable reliance exists. *Id.* To warrant the exception, it must be established that the attorney knew that the non-client would rely on the services rendered and that there was no potential conflict which would arise between the client and the non-client. *Id.*

■ The Debtor did not know that Go–Best would rely on the services rendered because it had no knowledge of Go–Best's existence. Moreover, a duty of care running from the Debtor to Go–Best would certainly create a potential conflict when the other party to the loan transactions described above was a partner of the firm. Under this analysis, I conclude that there was no foreseeable reliance and therefore no duty which ran from the Debtor to Go–Best.

Other cases with similar scenarios have described the standard slightly differently. Judge Sosman ruled that a partner had no duty to the clients of his former partner for the former partner's speculative investments on behalf of the client. *Fitzsimmons. v. Soutter*, 1994 WL 879599 (Mass. Sup.Ct.1994). She went on to explain that the partner could be vicariously liable under Supreme Judicial Court Rule 3:06(3)(b) which would render him liable for negligence of the other which "occurs in the performance of legal services by the corporation...." The judge acknowledged that investment services generally fall outside of the practice of law. *Id.* Under the circumstances of the case, however, she ruled such liability might have been found given that both lawyers had represented the client on a variety of matters, the investing occurred as part of the representation for estate planning, the firm billed the client and the fees went into the firm's account and the partner knew the other

was making the investments. These facts are clearly distinguishable in this case because the Debtor did not know about Go–Best or the loan transactions, no bills or payments ran between the Debtor and Go–Best and there was no testimony that the Debtor knew of Golding's investment activities.

In *Sheinkopf*, the First Circuit stated that "[i]t is theoretically possible that, even in the absence of an attorney-client relationship, a law firm could be liable for a partner's actions in spheres beyond the practice of law if the firm authorized those actions to be taken on its behalf." 927 F.2d at 1268. The court stated that one partner may be liable to another for misconduct if the partner had the authority of the other partners or if it occurred during the course of the business. *Id.* at 1269. The latter was not the case as investing is not considered the practice of law. *Id.* The former could not be established as the firm was not in the business of investing, the law firm did not benefit from the deal and there was not evidence that the firm knew of should have know of the activities. *Id.* Likewise here, the activities were outside of the scope of the Debtor's profession, the law firm did not benefit from the deals with Go–Best and there is no evidence that it knew or should have known that Goldings was borrowing money from parties to engaging in high-stakes investments.

Based upon the forgoing, I cannot conclude that the Debtor owed a duty to Go–Best for negligently monitoring the Account.

### IV. *Conclusion*

For the reasons set forth herein, I conclude that the Debtor has provided substantial evidence regarding its objection to the claim of Go–Best. Go–Best was unable to overcome the significant evidence

that the Debtor owed it no duty of care. Accordingly, I will enter an order sustaining the objection to claim.